NOTICE
Decision filed 07/29/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 241009-U

NO. 5-24-1009

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 23-CF-1169 |
| | ) | |
| EDWIN F. UNDERWOOD, | ) | Honorable |
| | ) | Thomas E. Griffith, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Boie and Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial counsel rendered ineffective assistance by repeatedly failing to object to inadmissible evidence that improperly bolstered the State's identification evidence. Considering counsel's deficiencies collectively, the defendant established a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.

¶ 2    On August 17, 2023, the defendant, Edwin F. Underwood, was charged by information with one count of burglary (720 ILCS 5/19-1(a) (West 2022)). The defendant was sentenced to 14 years in the Illinois Department of Corrections (DOC), followed by an 18-month term of mandatory supervised release (MSR). The defendant appeals from his conviction for burglary following a jury trial, asserting multiple instances of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). The claims arise from trial counsel's failure to object to (1) hearsay from an unidentified caller, (2) confrontation clause violations, (3) a *Doyle*

1

violation relating to defendant's termination of interrogation, (4) unredacted other-crimes statements in the defendant's interview, and (5) improper lay opinion identification testimony admitted without safeguards. The State disputes each point and maintains that either the evidence was admissible or counsel acted within reasonable strategy. For the following reasons, we reverse and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Preliminary Hearing

¶ 5     At the preliminary hearing, Officer Nathaniel Kane testified that just after midnight on August 10, 2023, police were dispatched to respond to a burglary at Biggin's Bar & Billiards in Decatur, Illinois. Someone had broken into the building and removed several bottles of liquor. The owner of the bar provided video surveillance to the police showing the commission of the burglary. According to Officer Kane, the video showed an individual dressed in "a distinctive pair of blue jeans with rips and black-and-white tennis shoes" and a dark hooded sweatshirt with the hood pulled up.

¶ 6     When K9 Officer Ryan Wicks and his dog arrived at the scene, they located a trash can with the stolen liquor. They continued tracking but did not locate any suspects. When Officer Kane returned to collect evidence, he heard a tree branch break, and, based on that sound, further tracking was done by the canine. Ultimately, officers located the defendant hiding in some brush. According to Officer Kane, the defendant was wearing "the same jeans or pants with a rip pattern and shoes as seen in the video." No motions *in limine* or substantive pretrial motions were filed.

¶ 7                                     B. Jury Trial

¶ 8     During opening statements, the prosecutor indicated to the jury the evidence would show that an individual broke into the bar, surveillance cameras recorded the individual walking around,

the individual grabbed "probably 10s of dollars' worth of liquor," threw it in the bar's garbage can, and left the building. While the individual's face was not shown, he was "wearing very distinctive pants." The prosecutor explained, "Someone apparently noticed this person walking down the street carrying this can and called the police thinking it was suspicious." Later the prosecutor stated, "[The defendant] chose to give an interview, and you'll get to see the interview because it was all recorded, and he basically has no explanation for why in the middle of the night he was hiding in the briar patch next to railroad tracks by a bar that had just been burglarized wearing the exact same pants." During opening statements, defense counsel told the jury they would be able to see the surveillance video for themselves, that the individual's face could not be seen, and that the individual could not be recognized based on the surveillance video.

¶ 9    Officer Kane testified that he had been dispatched to the bar for a burglary alarm. He described the area as a high crime area and explained that police got multiple calls there per night. When Officer Kane arrived at the bar, he observed a previously boarded up window that had the plywood removed. He assisted Officer Wicks in searching for the suspect, but they were unsuccessful. Officer Kane went back to the plastic trash can discovered earlier approximately one block from the bar. While walking toward the trash can, Officer Kane heard a large tree branch break in the tree line south of the trash can and alerted Officer Wicks to the sound. Officer Kane did not see anyone or hear anything else; he did not hear footsteps or running. Officer Wicks and his canine then went towards Van Dyke Street by the railroad tracks.

¶ 10    Officer Kane got called to help take the defendant into custody. When Officer Kane first saw the defendant, he was not wearing a sweatshirt, gloves, or a hat. He was wearing a black tank top. He did not have anything related to the burglary on his person and did not have any tools for

entering a building. According to Officer Kane, the defendant explained that he did not have drugs or guns on his person.

¶ 11     A portion of People's Exhibit 8 containing the first section of Officer Kane's body camera footage was played for the jury without objection. This video showed Officer Kane brushing cockleburs off the defendant and placing him in a squad car. After his interaction with the defendant, Officer Kane went back to get the trash can, took inventory of the evidence, and later turned it over to Officer Javion Crisman. The garbage can had been located on the north side of the tracks and the defendant was located on the south side of the tracks. The inventory of the trash can was captured on body camera video and played for the jury without objection.

¶ 12     Kevin Watkins, the owner of Biggin's Bar & Billiards, testified that he received a call from the police in the early morning hours of August 10, 2023, informing him that his bar had been burglarized. Watkins met with police at the bar and observed damage to the bathroom wall. Prior to August 10, the bathroom window had been boarded up. Watkins observed that the board had been ripped off, and a tree limb had been left in the bathroom. Watkins provided surveillance videos to the police. A portion of People's Exhibit 8, containing the surveillance footage from the bar, was published to the jury without objection. The first video was from a camera located on the wall facing the bar, showing the length of the bar and the bathroom door. The edited, black-and-white video showed an individual exit the bathroom at 12:04 am, enter the bar area, take various bottles, and put them in the bar's trash can. As the individual moved to the far end of the bar to take beer from the cooler, the individual is shown wearing a white shirt under a darker hooded sweatshirt.

¶ 13     The first surveillance video showed that as the individual turned toward the camera, he was wearing shoes, ripped jeans, a dark hooded sweatshirt with the hood pulled up and over a ball cap,

a mask, and gloves. The individual exited the camera view carrying the trash can. The second surveillance video showed the individual leaving the building. The third camera was outside the bar and showed an individual leaving the building. Watkins identified People's Exhibit 5 as his trash can, liquor, and beer. He determined that eight to ten bottles of liquor and two 16-ounce cans of beer had been taken.

¶ 14    Officer Wicks was dispatched to the bar along with his dog Magnus. Officer Wicks testified that a caller reported a suspicious person carrying a large item away from the bar. Magnus was described as "a fully certified dual purpose K9," certified in narcotics, tracking, article searching, and apprehensions. According to Officer Wicks, some of the jobs that canines do include tracking human scent, following paths created by human beings, and article searching, looking for items of evidentiary value that could be discarded or dropped by individuals.

¶ 15    Officer Wicks testified that using information provided by the caller, he determined the likely path that the suspect would have taken and deployed the K9 for a track of the individual from the area he was last seen. Magnus tracked southbound to the tree line running along the north side of the railroad tracks. When they came to the tree line, Magnus located a large plastic trash can, consistent with what the caller had reported. Officer Wicks once again deployed Magnus to track from the trash can to locate the suspect but was unable to do so. However, the dog kept going back to the trash can. Officer Wicks and Magnus began tracking westbound along the tree line but ran across some individuals who lived in the area. Officer Wicks claimed this encounter contaminated the area, making further tracking difficult because dogs could not specify between individual human beings and could only track the general human scent. He explained that encountering other individuals could disrupt the ability to continue a track. Officer Wicks decided further searching would not help and returned to the trash can.

¶ 16    Officer Wicks testified that Officer Kane reported hearing what sounded like someone walking through the tree line just south of the trash can. Since the tree line was extremely thick, Officer Wicks took Magnus around and up onto the train trestle to the railroad tracks behind the tree line. He was wearing a body camera during the incident, and approximately seven minutes of his body camera footage was played for the jury. The defendant was located approximately 42 minutes after the burglary.

¶ 17    After the defendant was in custody, Officer Wicks searched the general area for approximately 15-20 minutes looking for other individuals and conducted an article search looking for items of evidentiary value. However, Officer Wicks and Magnus were unable to find a sweatshirt, ball cap, gloves, or burglary tools.

¶ 18    Officer Crisman testified that he spoke to Watkins, who had downloaded and provided a thumb drive containing the surveillance videos. Officer Crisman directed a photograph be taken of the defendant's shoes and pants. The prosecutor questioned Officer Crisman as follows:

"Q. Now, why did you keep the pants and make sure to get a picture of the shoes?

A. Those were some of the items that stood out of the descripting [*sic*] factors of the individual that we were able to identify.

Q. Okay. And is that—you were able to identify from watching the videos in the store?

A. Yes, sir.

Q. Okay. Would it be fair to say—and I don't want to put words in your mouth— that the reason you kept the pants is they *matched* the pants that were shown on the video?

A. That's correct.

Q. And same with the shoes?

6

A. Yes, sir." (Emphasis added.)

Defense counsel failed to object to this testimony.

¶ 19     During cross-examination, Officer Crisman conceded that a lot of people wear black and white shoes and Lebron James shoes. He also agreed that a lot of people wear ripped jeans. Officer Crisman interrogated the defendant at the police department, which was recorded on the officer's body camera. Officer Crisman acknowledged that during the interview, the defendant was wearing a black tank top. When the trial court asked defense counsel if he objected to the jury being shown the interrogation video, he responded "no." The video was requested and viewed by the jury a second time during deliberations, also without objection.

¶ 20     The defendant was advised of his *Miranda* rights prior to the interrogation. During the interrogation, the defendant said he was at a drug house that he thought was going to be raided. The police had pulled up all over the block, causing everyone to run from the house. The defendant indicated multiple times that he did not have any drugs or guns on him, and he denied having any involvement in a burglary. He described the area as a high drug, high crime area so when police showed up, he hid. He explained that his son once had a confrontation with the police, and the defendant hid because he feared being shot. According to the defendant, "Somebody rode up on [his son], shot at him, he shot back, he ran." He explained, "Police run up, they shot, he shot, that's how it goes." The defendant stated that the people with him also ran when police arrived. When asked if he saw anything suspicious or anyone carrying anything heavy, the defendant replied, "No, that's a known drug area, shootings, bullshit, that's—I mean—that's—that's just what we do."

¶ 21     During the interrogation, Officer Crisman told the defendant, "[W]e got a call, a call about somebody matching your description, carrying something heavy down the street. Some random

7

person called." Officer Crisman said it looked "sketchy" that the defendant was found near the bar and the stolen items. The defendant denied any involvement in the burglary. After approximately eight minutes, the defendant stated, "Let's go, I'm done talking to ya." The interrogation was immediately ended.

¶ 22    At the close of the State's case, defense counsel moved for a directed verdict, and the following exchange occurred between the court and the prosecutor:

"THE COURT: Let me ask you a question. I couldn't—from the surveillance video—I don't see real well anymore, but I couldn't see what was depicted in there. Apparently, you could see the shoes and you could see the pants; correct?

MR. TIGHE [(ASSISTANT STATE'S ATTORNEY)]: Yes. The pants—it must have been a glare from the angle.

THE COURT: Yeah, I was not at a good angle.

MR. TIGHE: I've watched it, and you can see the person walking in the bar. They have on pants that have many, many, many rips in them. Well, they look like those pants there.

THE COURT: And the shoes also look similar?

MR. TIGHE: Yes.

THE COURT: All right. Very well. All right."

The motion for directed verdict was denied, and defense counsel did not present any witnesses or evidence.

¶ 23                    C. Jury Instruction Conference

¶ 24    At the jury instructions conference, the State submitted all the jury instructions read by the court, except IPI 2.04, failure of defendant to testify, which was requested by defense counsel. The

8

State did not submit IPI 3.15B, which addresses law enforcement identification opinion evidence. Defense counsel did not submit any other proposed instructions or object to any of the State's proposed instructions.

¶ 25                          D. Closing Arguments

¶ 26    During closing arguments, the prosecutor argued that the defendant took items from the bar, fled, abandoned those items in the trash can at the tree line, and the police found him hiding on the other side of the tracks. The prosecutor told jurors that "the defendant also just happened to be wearing the same pants and the same shoes as the person who was seen on the video surveillance inside the bar." During rebuttal, the prosecutor reminded jurors that police "gave [the defendant] the chance to talk to them." Defense counsel failed to object.

¶ 27                    E. Jury Deliberations and Verdict

¶ 28    During deliberations, the trial court received a jury note asking to see Officer Crisman's interview of the defendant as well as the surveillance footage from the bar. The trial court responded to the note, without objection, stating, "The interview between the defendant and then Officer Crisman, and the surveillance footage from the bar are on the laptop computer." Without objection, People's Exhibit 8, the DVD containing all the trial exhibits, was loaded onto a computer and sent to the jury.

¶ 29    The jury later sent a second note to the trial court stating, "What did the caller say the description of the individual was when they called 911?" After deliberating with counsel, the trial court responded, "Please refer to your notes and collective memory and continue with your deliberations." The jury found the defendant guilty of burglary.

9

¶ 30                          F. Posttrial Motions and Sentencing

¶ 31    Defense counsel's posttrial motion for a new trial asserted only that the evidence was insufficient to find the defendant guilty beyond a reasonable doubt and specifically stated the case was "largely circumstantial." Defense counsel argued the State's key evidence was that the defendant was found near the burglary "wearing pants and shoes consistent with the burglary suspect." The motion explained that "many people wear similar pants and shoes" and that the defendant was wearing a black tank top, "whereas the suspect was wearing a white t-shirt, a sweatshirt, a hat, and gloves, all of which were never recovered despite a K9 article search." The motion was denied.

¶ 32    At the sentencing hearing on June 7, 2024, the trial court determined the defendant was subject to mandatory Class X sentencing and sentenced him to 14 years in DOC, followed by an 18-month term of MSR. On June 20, 2024, defense counsel filed a motion to reconsider the sentence, asserting it was excessive based on the mitigating factors. After the motion to reconsider was denied, the defendant timely appealed.

¶ 33                                    II. ANALYSIS

¶ 34    The defendant concedes that defense counsel did not object to the errors at trial or raise the issues in a posttrial motion. Nevertheless, he argues that review and relief are warranted as a claim of ineffective assistance of trial counsel or, alternatively, under the first prong of the plain error doctrine. To preserve a purported error for appellate review, a defendant must both object at trial and raise the alleged error in a written posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48; see also *People v. Jackson*, 2022 IL 127256, ¶¶ 15-20. "Failure to do either results in forfeiture." *Sebby*, 2017 IL 119445, ¶ 48; see also *Jackson*, 2022 IL 127256, ¶¶ 15-20. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the

trial court. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Because we conclude the defendant received ineffective assistance of counsel, we decline to address the defendant's remaining arguments.

¶ 35                    A. Ineffective Assistance of Counsel Claims

¶ 36                    1. Failure to Object to Inadmissible Hearsay

¶ 37    The defendant contends that trial counsel was ineffective for failing to object to repeated references to the substance of the unidentified 911 caller's report. Specifically, he argues the prosecutor referred to the caller's observations during opening statement, Officer Wicks testified regarding the substance of the caller's report, and Officer Crisman repeated those observations during the recorded custodial interview played for the jury. The defendant asserts these repeated references constituted inadmissible hearsay and uncross-examined identification evidence. He further contends the jury considered the statements substantively, as demonstrated by its request during deliberations for the description the caller provided to police.

¶ 38    The State responds that the statements were not offered for their truth but were admissible as background information explaining police conduct. It asserts that the substance of the statements was limited, did not directly identify the defendant, and served only to explain investigatory steps.

¶ 39    The Constitutions of the United States and Illinois guarantee a criminal defendant the right to effective assistance of defense counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A defendant's claim of ineffective assistance of defense counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim of ineffective assistance of defense counsel, "a defendant must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 61. "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. Whether counsel was ineffective

11

is a mixed question of fact and law. *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 222. "[T]he ultimate question of whether defense counsel's actions support a claim of ineffective assistance is a question of law that is subject to *de novo* review on appeal." *Id.*

¶ 40    "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). "This means the defendant must show that counsel's errors were so serious, and his performance so deficient, that he did not function as the 'counsel' guaranteed by the sixth amendment." *Id.* at 342.

¶ 41    The general rule is that defense counsel is presumed to pursue sound trial strategies. *People v. McMillin*, 352 Ill. App. 3d 336, 344 (2004). This presumption of soundness of defense counsel's performance gives way to a finding of deficiency only where no reasonably effective criminal defense attorney, confronting the trial's circumstances, would engage in similar conduct. *Id.*

¶ 42    Hearsay is an out-of-court statement offered to prove the truth of the matter asserted (*People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 38) and is generally inadmissible at trial unless it falls within an exception to the rule (*People v. Cloutier*, 178 Ill. 2d 141, 154 (1997)). "The fundamental reason for excluding hearsay is the lack of an opportunity to cross-examine the declarant." *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004). Statements are not hearsay when offered for the limited purpose of showing the course of a police investigation where such testimony is necessary to fully explain the State's case to the jury. *Id.* A police officer may " 'testify about statements made by others, such as victims or witnesses, when such testimony is not offered to prove the truth of the matter asserted, but is instead used to show the investigative steps taken by the officer leading to the defendant's arrest.' " *Id.* (quoting *People v. Pulliam*, 176 Ill. 2d 261, 274 (1997)). However, " 'there is a distinction between an officer testifying to the fact that he

12

spoke to a witness without disclosing the contents of that conversation and an officer testifying to the contents of the conversation.' " *Id.* (quoting *People v. Trotter*, 254 Ill. App. 3d 514, 527 (1993)). Thus, while an officer may testify that he spoke with a witness and thereafter took certain investigative steps, the officer generally may not disclose the substance of the witness's statements unless independently admissible. *Id.*; *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 23 (an officer may not testify to the contents of any statements received or to information beyond what is necessary to explain his actions).

¶ 43    On this record, the substance of the caller's statements exceeded what was necessary to explain the course of the police investigation. The jury heard that an unidentified caller reported seeing an individual carrying a large object and, more significantly, Officer Crisman told the defendant during the recorded interview that the caller had observed someone "matching" the defendant's description. Although the caller never testified and never described the suspect, Officer Crisman's characterization conveyed to the jury that an unidentified citizen had identified the defendant as the individual observed shortly after the burglary. The jury's own question during deliberations requesting the description provided by the caller confirms that the jury considered the statements as substantive evidence bearing upon the identity of the perpetrator rather than merely background explaining police conduct. Trial counsel's failure to object permitted the jury to consider uncross-examined identification evidence in a case where identity was the principal disputed issue.

¶ 44    To establish prejudice, a defendant must show that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004) (citing *Strickland*, 466 U.S. at 694). "Regarding the second *Strickland* prong, a reasonable probability that the result would have been different is a probability

13

sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Id.* at 220. The defendant must "affirmatively prove" that prejudice resulted from defense counsel's errors, as "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *People v. Johnson*, 2021 IL 126291, ¶¶ 54-55 (citing *Strickland*, 466 U.S. at 693). These principles guide our prejudice analysis. As discussed more fully below, counsel's failure to prevent the jury from considering this evidence contributed to the cumulative prejudice that undermines confidence in the verdict.

¶ 45    Here, the jury heard Officer Crisman tell the defendant during interrogation that an unidentified caller had reported seeing a suspect "matching" the defendant's description carrying a large object. The implication that the suspect "matched" the defendant's description did not originate with the caller; it originated with Officer Crisman. When the State presented the interrogation video to the jury, that statement created the impression that the anonymous caller had observed someone resembling the defendant. In this way, Officer Crisman's statement was treated by the jury as an assertion that an unidentified citizen had reported seeing someone who looked like the defendant. Even though the caller never described the suspect, the officer's statement effectively transformed an otherwise neutral, nonspecific call into identification-like evidence. As identity was the sole contested issue at trial, the officer's representation of what the caller supposedly observed carried probative weight and directly bore on the defendant's identity. Consequently, the officer's statements transformed an otherwise nonspecific report into uncross-examined identification evidence directly linking the defendant to the burglary.

14

¶ 46    2. Failure to Object to Testimonial Hearsay in Violation of the Confrontation Clause

¶ 47    The defendant next argues that the identification statements that were not subject to cross-examination violated the confrontation clause. He asserts that although the unidentified caller did not provide any description of the suspect, the officer's comments in the interrogation video conveyed to the jury that the caller had reported seeing an individual "matching [the defendant's] description" carrying a large object. The defendant contends that this representation constituted testimonial hearsay and, therefore, could not be admitted unless the State established both the caller's unavailability and a prior opportunity for the defendant to cross-examine the caller. See *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

¶ 48    "The confrontation clause in the sixth amendment to the United States Constitution, which applies to the states through the fourteenth amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him.' U.S. Const., amends. VI, XIV; [citation]." *People v. Allen*, 2016 IL App (4th) 140137, ¶ 49. The confrontation clause ensures the reliability of testimonial evidence through cross-examination. *Maryland v. Craig*, 497 U.S. 836, 845 (1990). We first consider whether the caller's statements, as presented by the officer, were "testimonial" within the meaning of the confrontation clause. In *Davis v. Washington*, 547 U.S. 813, 822 (2006), the United States Supreme Court held that statements are testimonial when their primary purpose is to establish or prove past events potentially relevant to a later criminal prosecution and when the circumstances demonstrate the absence of an ongoing emergency.

¶ 49    Here, the unidentified caller contacted police after the burglary had concluded and reported observing an individual carrying a large object away from the area. Because the statements were made for the purpose of assisting law enforcement in investigating completed criminal conduct,

15

they were testimonial under *Davis*. The Illinois Supreme Court has applied the same principles, recognizing that statements elicited for fact-gathering in a non-emergency context are testimonial and trigger constitutional protections. *People v. Stechly*, 225 Ill. 2d 246, 279 (2007). Accordingly, the caller's statements could be admitted only if the State demonstrated that the declarant was unavailable and that the defendant had a prior opportunity to cross-examine the declarant.

¶ 50   Here, the State made no attempt to establish the caller's unavailability, nor did it present any evidence suggesting that the defendant had any prior opportunity to confront the caller. Nevertheless, the jury repeatedly heard Officer Wicks recount the 911 caller's report and later heard Officer Crisman state during the defendant's recorded interview that the caller observed someone "matching" the defendant's description. By presenting these assertions, the State effectively placed before the jury accusatory testimonial hearsay while preventing cross-examination of the declarant. This procedure is inconsistent with *Crawford*, which prohibits admission of testimonial hearsay unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 53-54. The admission of the statements, therefore, contravened the confrontation clause.

¶ 51   We next consider whether Illinois evidentiary rules provide a basis to admit the statements independent of constitutional inquiry. The statements were hearsay, offered for the truth of the matter asserted, and the State identified no applicable exception under the Illinois Rules of Evidence. Although courts should resolve cases on nonconstitutional grounds when possible (*People v. Lee*, 214 Ill. 2d 476, 482 (2005)), nothing in the Illinois evidentiary framework renders these statements admissible. Because the statements are testimonial hearsay and no evidence rule permits their introduction, constitutional analysis is not merely appropriate but unavoidable. Under

16

*Crawford*, *Davis*, and their Illinois counterparts, the admission of such testimonial statements absent unavailability and prior cross-examination constitutes reversible error.

¶ 52    Based on this record, we conclude that the statements conveyed to the jury through Officer Crisman's interrogation remarks presented testimonial assertions implying that the defendant matched the suspect observed by an unidentified caller. Their admission in the absence of cross-examination violated the sixth amendment. Although the State characterizes the statements as non-hearsay background information, their substance was clearly used to provide an evidentiary link between the defendant and the offense. Admission of the officer's representation that an unidentified caller observed someone "matching" the defendant's description infringed the defendant's confrontation rights under *Crawford* and *Davis*. The error is not harmless where the testimonial hearsay supplied the identification implication the State relied upon and where no independent evidentiary doctrine justified its admission. Defense counsel's failure to object therefore permitted constitutionally infirm testimonial hearsay to be placed before the jury. Trial counsel, therefore, should have objected to the admission of these testimonial statements. Because those statements supplied the jury with uncross-examined evidence linking the defendant to the burglary, we consider this deficiency as part of our cumulative prejudice analysis under *Strickland*.

¶ 53                    3. Failure to Object to *Doyle* Violation

¶ 54    The defendant next argues trial counsel rendered ineffective assistance by failing to object when the jury heard evidence that, after receiving *Miranda* warnings and answering questions during his custodial interview, the defendant invoked his right to remain silent by stating, "I'm done talking to ya." The defendant contends the admission of that evidence violated the principles announced in *Doyle v. Ohio*, 426 U.S. 610 (1976), and that reasonably competent counsel would

17

have objected or sought to redact that portion of the recorded interview before it was published to the jury.

¶ 55    It is well settled that the State generally may not use a defendant's post-*Miranda* silence against him. *People v. Dameron*, 196 Ill. 2d 156, 163 (2001). In *Doyle*, the Supreme Court held that it is fundamentally unfair to assure a defendant through *Miranda* warnings that he has the right to remain silent and then use the exercise of that right against him. *Id.* at 618. Likewise, Illinois has long recognized, as a matter of evidentiary law, that evidence of a defendant's post-arrest silence is generally neither material nor relevant to proving guilt. *People v. Pinkett*, 2023 IL 127223, ¶ 31. Here, the jury heard the defendant terminate the custodial interview by stating, "I'm done talking to ya," after receiving *Miranda* warnings, thereby presenting the jury with the defendant's exercise of his constitutional right to remain silent.

¶ 56    The State argues the reference to the defendant's post-*Miranda* silence was brief, not emphasized, and therefore harmless. *Dameron* identifies several factors relevant to determining whether a preserved *Doyle* violation is harmless beyond a reasonable doubt. See *Dameron*, 196 Ill. 2d at 164. *Pinkett* likewise applied those factors in reviewing preserved trial error. See *Pinkett*, 2023 IL 127223, ¶¶ 40, 51. Here, however, the defendant raises the issue through a claim of ineffective assistance of counsel. Accordingly, the question before us is not whether a preserved *Doyle* violation was harmless but whether reasonably competent counsel should have objected to the admission of the defendant's invocation of his right to remain silent and whether counsel's failure to do so contributed to prejudice under *Strickland*.

¶ 57    We conclude that it did. The jury was permitted to hear the defendant terminate the custodial interview by stating, "I'm done talking to ya." Although brief, that evidence informed the jury that the defendant chose to end questioning after receiving *Miranda* warnings. Under both

18

*Doyle* and Illinois evidentiary law, the defendant's exercise of that right was not proper substantive evidence of guilt and should not have been presented to the jury.

¶ 58 Standing alone, this isolated reference might not warrant reversal. This case, however, does not involve a single evidentiary error. As previously discussed, trial counsel likewise failed to object to inadmissible hearsay and confrontation clause evidence that strengthened the State's identification case. The defendant's recorded interview likewise contained additional statements that counsel failed to seek to redact, including references to a "drug house," drugs, guns, a "high drug, high crime area." Thus, we do not evaluate the *Doyle* violation in isolation, but as one of several ways in which defense counsel failed to prevent the jury from considering inadmissible or unfairly prejudicial evidence.

¶ 59 Under these circumstances, reasonably competent counsel would have objected to, or sought redaction of, the portion of the interview that revealed the defendant's invocation of his constitutional right to remain silent and placed before the jury evidence that Illinois law recognizes as generally inadmissible and irrelevant to proving guilt. See *Pinkett*, 2023 IL 127223, ¶ 31. As *Pinkett* recognizes, a defendant's invocation of the right to remain silent cannot properly be used to invite the jury to infer consciousness of guilt. *Id.* ¶ 51. Because identity was the principal issue at trial, the State's proof was largely circumstantial, and the jury viewed the defendant's recorded interview in its entirety, counsel's failure to prevent the jury from hearing the defendant's post-*Miranda* invocation contributed to the cumulative prejudice discussed below.

¶ 60 4. Failure to Request a *Thompson* Hearing

¶ 61 The defendant next argues trial counsel rendered ineffective assistance by failing to challenge Officer Crisman's lay opinion identification testimony. Specifically, the defendant contends counsel should have requested the hearing outside the presence of the jury required by

*People v. Thompson*, 2016 IL 118667, before Officer Crisman was permitted to identify the defendant as the individual depicted in the surveillance recordings.

¶ 62   Illinois Rule of Evidence 701 permits lay opinion testimony where the opinion is rationally based on the witness's perception and helpful to determining a fact in issue. Ill. R. Evid. 701 (eff. Jan. 1, 2011); *Thompson*, 2016 IL 118667, ¶ 41. In *Thompson*, the supreme court explained that lay opinion identification testimony may be admissible where "there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." (Internal quotation marks omitted.) *Thompson*, 2016 IL 118667, ¶ 41. The supreme court further instructed that whether such testimony is admissible is determined under the totality of the circumstances. *Id.* ¶ 51. Relevant considerations include the witness's familiarity with the defendant, the witness's familiarity with the defendant's appearance at the time of the offense, whether the defendant altered or disguised his appearance, and the clarity and completeness of the surveillance recording. *Id.* ¶ 50.

¶ 63   Recognizing the unique concerns presented when the identification witness is a law enforcement officer, the supreme court instructed that, before admitting such testimony, the circuit court should afford the defendant an opportunity to examine the officer outside the presence of the jury. *Id.* ¶¶ 55, 59. The purpose of that procedure is to permit the circuit court to assess the officer's familiarity with the defendant, evaluate the potential for unfair prejudice, and determine whether the testimony's probative value substantially outweighs its prejudicial effect before the jury hears the identification evidence. *Id.* ¶ 59.

¶ 64   Here, Officer Crisman testified that the defendant's clothing *matched* the clothing worn by the individual depicted in the surveillance recordings. Trial counsel never requested the hearing contemplated by *Thompson*, nor did counsel ask the trial court to determine whether Officer

20

Crisman possessed familiarity with the defendant beyond that possessed by the jury. Consequently, the trial court was never asked to determine whether Officer Crisman possessed a level of familiarity with the defendant that rendered his opinion more helpful than the jury's own assessment of the surveillance recordings. Nor was the trial court afforded an opportunity to balance the testimony's probative value against its potential for unfair prejudice before the testimony was presented to the jury.

¶ 65     That omission was significant where identity was the principal issue contested at trial. The surveillance recordings did not reveal the perpetrator's face, and the State relied primarily upon circumstantial evidence to establish that the defendant was the individual depicted therein.

¶ 66     Under those circumstances, Officer Crisman's opinion that the defendant's clothing matched the individual depicted in the surveillance recordings carried significant weight because the surveillance recordings did not reveal the perpetrator's face. Whether that opinion satisfied the standards announced in *Thompson* should have been resolved by the circuit court before the jury ever heard it.

¶ 67     We need not determine whether Officer Crisman's testimony ultimately would have been admitted had trial counsel requested a *Thompson* hearing. The question before us is whether reasonably competent counsel would have requested the procedural protections our supreme court prescribed for precisely this type of testimony. We conclude that competent counsel would have done so. Counsel's failure to request the hearing deprived the trial court of the opportunity to determine the admissibility of the testimony under *Thompson* and permitted the jury to hear identification testimony without the required safeguards.

¶ 68     We further conclude this deficiency contributed to the prejudice suffered by the defendant. As previously discussed, the State's case depended largely upon circumstantial evidence of

21

identity. Officer Crisman was permitted to tell the jury that the defendant's clothing matched the individual shown in the surveillance recordings without the circuit court first conducting the hearing required by *Thompson*. Officer Crisman's identification testimony was presented alongside the uncross-examined statements attributed to the unidentified caller and the defendant's post-*Miranda* invocation of his right to remain silent. Collectively, these errors repeatedly strengthened the State's circumstantial proof identifying the defendant as the burglar. Accordingly, we include counsel's failure to invoke the procedural protections required by *Thompson* as part of our cumulative prejudice analysis under *Strickland*.

¶ 69                                B. Cumulative Prejudice

¶ 70    Although we have addressed each instance of deficient performance separately, our assessment of prejudice does not end there. Under *Strickland*, the question is whether counsel's deficient performance, considered as a whole, undermined confidence in the outcome of the proceeding. Accordingly, we evaluate counsel's deficiencies collectively rather than in isolation.

¶ 71    This was not a case in which the State presented direct evidence identifying the defendant as the individual who entered Biggin's Bar & Billiards. The surveillance recordings showed the perpetrator's clothing and movements but did not reveal his face, leaving the jury to determine identity almost entirely from circumstantial evidence. No eyewitness identified the defendant as the burglar, and the State's case rested largely upon circumstantial evidence connecting the defendant to the person depicted in the recordings. Consequently, identity constituted the principal issue for the jury's resolution.

¶ 72    Rather than preventing the jury from considering inadmissible evidence bearing upon that issue, trial counsel repeatedly failed to object as the jury heard evidence improperly strengthening the State's proof of identity. The jury heard Officer Wicks recount the unidentified caller's report

22

and later heard Officer Crisman tell the defendant that the caller had observed someone "matching" the defendant's description carrying a large object. The jury also heard the defendant terminate the custodial interview by stating, "I'm done talking to ya," after receiving *Miranda* warnings. Finally, Officer Crisman was permitted to identify the defendant as the individual depicted in the surveillance recordings without the trial court first conducting the hearing contemplated by *Thompson*. Although we have analyzed each deficiency separately, their combined effect repeatedly reinforced the State's circumstantial evidence of identity. As our supreme court recognized in *People v. Blue*, 189 Ill. 2d 99, 139 (2000), multiple errors may collectively create "a pervasive pattern of unfair prejudice" requiring reversal even where each error is separately considered.

¶ 73     The record further demonstrates the significance the jury placed upon this evidence during its deliberations when it specifically asked, "What did the caller say the description of the individual was when they called 911?" It also requested that portions of the recorded interview be replayed. Those requests objectively demonstrate that the jury focused upon evidence that should not have been presented in the manner it was. Although neither request alone establishes prejudice, both reinforce our conclusion that the improperly admitted evidence bore directly upon the issue the jury found most significant, that is, whether the defendant was the individual depicted in the surveillance recordings.

¶ 74     While the sixth amendment does not guarantee the defendant a perfect trial, it does guarantee the effective assistance of counsel and a trial in which the verdict rests upon properly admitted evidence. Here, identity was the central issue at trial. Yet counsel repeatedly failed to prevent the jury from considering uncross-examined identification evidence, the defendant's post-*Miranda* invocation of his constitutional right to remain silent, and lay opinion identification

testimony admitted without the procedural safeguards required by *Thompson*. Collectively, those deficiencies permitted the jury's determination of identity to rest, in part, upon evidence that should not have been considered in resolving that issue. We, therefore, conclude there exists a reasonable probability that, absent counsel's deficient performance, the result of the proceeding would have been different. Accordingly, the defendant has established prejudice under *Strickland*.

¶ 75                                    C. Guidance on Remand

¶ 76     Because we conclude this matter must be remanded for a new trial, we briefly address one additional issue likely to recur. *People v. Currie*, 2023 IL App (2d) 220114, ¶ 64 ("when appropriate, a reviewing court may address issues that are likely to recur on remand, in order to provide guidance to the lower court"). The defendant also argues trial counsel rendered ineffective assistance by failing to seek additional redactions from the recorded custodial interview before it was published to the jury. Specifically, the interview included the defendant's references to being at a "drug house," repeated references to drugs and guns, his characterization of the area as a "high drug, high crime area," and his statement: "No, that's a known drug area, shootings, bullshit, that's—I mean—that's—that's just what we do." In light of our disposition, we need not determine whether counsel's failure to obtain those additional redactions independently constituted ineffective assistance. Nevertheless, should the recorded interview again be offered into evidence on retrial, the circuit court should carefully consider whether those references are relevant to any material issue before the jury or whether their probative value, if any, is substantially outweighed by the danger of unfair prejudice. Resolving that question in advance of trial will assist in ensuring the jury considers only evidence properly bearing upon the issues to be decided.

¶ 77                        III. CONCLUSION

¶ 78    For the above reasons, we reverse the defendant's conviction and remand the case for a new trial.


¶ 79    Reversed and remanded.